Max Ray for Anita Rushing in the Social Security Disability case. The only occupation that the vocational expert was able to identify in response to the ALJ's first hypothetical was Surveillance System Monitor. That simplifies the scope of what needs to be considered in response at the residual functional capacity dispute. Because if that's the only job we're looking at, and it is, the only additional limitation that is really outcome material is whether or not Klayment can sustain an 8-hour-a-day, 40-hour work productive schedule with her needs for extra rest. Now, Klayment never alleged that she was entirely incapable of functioning, and I suggest to the Court that the best summary of what she said she could do is the January 10, 2001 Activities of Daily Living Summary and Pain Questionnaires at 203-212. She's doing quite a lot. She's doing it within the home, with pain, and with rest. At 211, she's saying she's up and active an hour before rest. She begins things she can't finish. She has to go back. 212, Hobbies, 30 minutes, sewing, 10 before her hands cramp up. That's not inability to function, but that's not 8-hour-a-day, 40-hour-a-week competitive productivity. The administrative law judge also looked at the husband's testimony, and he found that testimony to be accurate. What he said is that it's accurate based on what he observed and what he was told. He gives three reasons for not crediting this accurate testimony. First, he says that there's a contradiction regarding whether the medical treatment was of benefit. When you look at the evidence as a whole, even though there are instances where claimant has had transitory benefit from medical care, the overall pattern is not one of material difference. The second reason that the judge gave is an attitude of incapable of functioning. Well, the husband does say that she's not capable of maintaining 8-hour-a-day productivity since 1999. He does say that she's had difficulty leaving home, but the fact that his observations support him in that as he talks about her pain and her difficulties doesn't provide that as a basis to discredit his testimony. That's what his testimony is. Well, counsel, the problem, quite honestly, that I have with this case is the testimony of Ms. Rushing's mother. Yes. She seemed to indicate that she could do all sorts of things and was doing all sorts of things. It really is consistent, though, when you read it and lay it beside these other things. She's seeing the mother once, maybe twice a week. Mr. Ray, pull your mic up. You know what's happening? It's the wind. I'm sorry. It's causing the static. Yes. All right, go ahead. I'll try and behave. Oh, don't worry. You go ahead. Don't be as free as you want. Okay. But if you pull that up, you won't get that wind going. All right. The mother describes in a more summary fashion the functioning of her daughter, the claimant. Yes. She's taking care of the house. She's visiting friends. She's going out. I mean, this is the mother testifying, that she can do all of these things. And she can. She can. She can do all those things. But she can't do anything for eight hours a day, is your point? That's my point. That's my point. There's not an inconsistency if you look at the question of sustained functioning. And I suggest this inability to function is not the Social Security test. If that were the standard, if that was what claimant had said she was limited to, there would be inconsistency and we'd have problems. But that's not the standard, and that's not what claimant maintained. When she described her own activities of daily living, when she described her own limitations from pain, she acknowledged the things that she's doing in the home. But there's a big difference between what one can do in their home with opportunity to take medicine and opportunity to rest, compared to what one can do when they're on the clock, paid by the hour by an employer. That's the point. The second area that I want to make. A child, Mr. Hershing? I'm sorry, Your Honor. She has a child. Of who she teaches at home? Yes. She has a child at home. Essentially a full-time child. To teach a child seven hours a day. And she was homeschooling the child. She says that she would get the child started, then she would sit in the recliner and put her legs up. They take breaks every half hour. They were on a schedule, but that schedule was not with the rigidity. She says they're not always on a good schedule. Well, if you're working for an employer, you're going to need to be on the employer's schedule. Again, she's able to do quite a lot. She is. But not eight hours a day, 40-hour week productivity. When you turn to the treating doctor, Dr. Weeks, Dr. Weeks has long-term familiarity with this lady. The judge's problem with Dr. Weeks was that the neurosurgeon and the rheumatologist, Dr. Hubbard and Dr. May, the ALJ says that their objective findings refute the limitations. I think he's got it wrong. The objective findings do not confirm the limitations. But the fact that objective findings do not confirm limitations means that a judgment has to be made regarding the symptoms and their effect on this individual. You don't need to have objective findings confirming the extent of the limitations. This doctor knew her well, knew her over a long period of time, and I think that her judgment, based upon her observations, her familiarity, her observations of what Klamath has done in response to treatment, put her in an excellent position to make the clinical judgment that this lady would need a couple hours a day of rest. If you find that this lady is not able to sustain eight hours a day, 40-hour week productivity on a consistent basis, it's a pay case. If you credit the accurate testimony of the husband, if you find that the treating doctor is persuasive, then there is no possibility of full-time work. Well, let me just ask. The vocational expert talked about several things, but it turns out that the only one that would not require her to use her hands and her wrists was surveillance system monitor. And whether or not that requires eight full hours without breaks and so forth is another question, but the question I have, they said this particular job exists 600 places, literally 60,000 places nationally. What should be the test? I mean, how many jobs? Assuming, I realize you disagree, but assuming that she could do this job, just what is the significant number of jobs that would be required? You're right that the vocational expert did not get the same hypothetical as the judge's RFC. And part of the frequent range, and there's a discussion in the briefs about whether she could do, actually do the security system monitor. The finding, the commissioner's finding as to significant numbers of jobs was based on the assumption that there were 700,000 jobs in the labor market. Let's assume that 600 locally is 60,000 nationally. Yes. If that's all we're down to, then we don't have a significant numbers finding. Why not? Because there is a tremendous difference between a 700,000 job pool and a 60,000 job pool. A 60,000 job pool would still be sufficient. How does one make that determination? That's a critical question. Because that, unlike lots of other things, is ascertainable by comparison to other cases and it certainly would be adequate. It's a case-by-case assessment. Why would it be a case-by-case assessment? Because that's the way the commissioner does it. As to that question, I mean, it seems to me that it should be uniform. Why should it be a case-by-case assessment? We wish that everyone were the same. This isn't about people. This is about the jobs available. It's a standard. How many jobs has to be available before there are enough jobs available? If a person is 50 years old, this woman isn't, the numbers of jobs that's available, that needs to be available in order for there to be substantial numbers of jobs, has to exceed the entire sedentary, unskilled labor market. Because in those instances, people are found disabled based on insufficient jobs, even if the entire sedentary labor market is available. It is a flexible standard on which there are a number of factors. Well, you seem to argue that we shouldn't take into consideration information regarding the Survey.System Monitor occupation that does not appear in the Bound Dictionary of Occupational Titles. That's it. If it's not in there, it's not in there. Well, the additional information available on Westlaw that comes from Dot's sister publication, Selected Characteristics of Occupations Defined in the Revised DOT, is it really reasonable to interpret social security regulations in a way that prohibits us from considering the information in the Department of Labor produced for the specific purpose of supplementing the DOT? The purpose of it is to supplement. Why shouldn't we consider it? I don't mind considering the Selected Characteristics. The document that the appeals counsel went to where they came up with this one-third manual dexterity, that's not in the DOT. That's not in the Selected Characteristics. I don't know where that came from, but I didn't get notice, an opportunity to cross-examine or anything with respect to that. That's thin air as far as this claimant is concerned. What do they say? I'll defer to counsel on where they got that. I'm not in a position to describe it. They said it came out of Westlaw. Well, Westlaw is not the Bureau of Labor. It's not in that book, and it's not in the Selected Characteristics. I don't know where it came from. Oh, well, it's available on Westlaw, but it comes from the supplement. No, it doesn't, Your Honor. I don't know where the material that I cite come from the supplement. The material that they cite about percentages and manual dexterity, I have no idea where that comes from. I simply don't. All right. We'll ask opposing counsel. Yes. Thank you, Your Honor. Thank you. Where does it come from? Good morning, Your Honors. Good morning. May it please the Court, my name is Matthew Pyle, and I represent the Commissioner of Social Security. It comes from the electronic version of the Dictionary of Occupational Titles, which is found on Westlaw. There is more information on the electronic version of the Dictionary of Occupational Titles, which is found on Westlaw, than there is in the bound version of the Dictionary of Occupational Titles. And that is in the percentages that the Appeals Council cites in its decision not to assume jurisdiction and correlate exactly to that electronic version of the Dictionary of Occupational Titles. There is no reason to think that the electronic version is any less official than the bound version. It is titled Dictionary of Occupational Titles. Is there a different publication date for them? I don't know that, Your Honor. But at the bottom of the document, the electronic document, it says no claim to U.S. government works. So I infer from that that it is still a government publication, that it is a publication of the Dictionary of Occupational Titles. Well, I can tell you that I have not on this issue, but on legal documents, have run into real problems with Westlaw. Legislative history or stats, federal statutes with material in the middle of sentences that is not in the middle of sentences, footnotes from opinions that never show up in Westlaw, although they do show up in F2 and F3. So I don't know that we can make that assumption unless we had some idea to know why they were different. I did take the liberty of looking into, on Westlaw, there is an icon that has a little eye on it. And I just learned about this the other day, so it does not appear in my brief. But if you click on that icon, it gives you information about where the document came from. It is, according to that information, it is the Dictionary of Occupational Titles and information that, as I understand it, the Department of Labor asked a North Carolina occupational agency to compile for the Department of Labor. And so it is a government agency, as I understand it, that compiled this additional information under the regulations. That would be an appropriate additional set of information that the commissioner can rely on. And I would point to the regulation that Plano Cites in her brief, Section 404.1566, gives a list of examples of reliable occupational data that the commissioner is permitted to rely upon. And the first of those examples is the Dictionary of Occupational Titles. And after that, there are census information and other documents that are listed as examples of reliable. But there is a difference between relying on it and relying on it in a circumstance in which there is no opportunity to rebut it. In other words, this was a question of judicial notice. It's one thing to say they can rely on it, meaning they can come into a hearing and present it. And it's another thing to say that they can rely on it in an opinion when it was never mentioned before in the case. This is done purely, Your Honor, in this case. And the instance in which this arose was not in the ALJ's decision, but in the Appeals Council's explanation in its decision not to assume jurisdiction. Well, for an error that was in the district, it's really to patch up a problem with an error that the ALJ made. So the ALJ made an error, and the Appeals Council, in trying to explain why it was not a material error, then goes essentially outside the record into something that perhaps they can use. But using it in a nonrebuttable, examinable way is sort of a different problem. But the information is correct, Your Honor. And it is accurate. And it is an accurate description of why there was no error at that or where there was no harmful error at that point. It's correct. You mean that it's where it purports to be, but it doesn't make it correct. It was. The Appeals Council accurately cited the information. And the information is the sort that the Appeals Council is permitted to take administrative notice of. And it is. And even moving away from the exact percentages that the Appeals Council discusses, the 11 percent to 33 percent, the Dictionary of Occupational Titles, or at least the electronic version of it, has other places in it that discuss manipulative limitations. It says that there are no fingering, handling, or feeling requirements for the surveillance system monitor position. It says in another portion that handling is not a significant activity in that job. And even just common sense says that a surveillance system monitor is not going to be using their hands more than 33 percent of the time, which is the occasional range. Did the residual functional capacity determination include having to take breaks? No. It did not? It did not. Except to say at the end of it that there would be normal work breaks. So there were no extra limitations due to work breaks, but there was a finding relating to work breaks saying that there would be normal work schedule would be permissible or would be permitted for this claimant. With respect to significant numbers, I also wanted to just quickly point out that that very same regulation, 1566, doesn't exactly state what significant numbers is, but it does say what it is not. And I think from that we can tell that, in this case, the 60,000 jobs for surveillance system monitor would be significant. And I quote from that regulation, it's isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live, are not considered work which exists in the national economy. And earlier that's defined to include significant numbers. So I would point out that 60,000 jobs nationally does not meet this exclusion of what significant jobs means. Mr. Ray also mentioned that Dr. Weeks had a long-term familiarity with Ms. Rushing, and that is true, but so did the two treating specialists that Dr. Weeks referred Ms. Rushing to, Dr. Hubbard and Dr. May. Both of those were treating specialists. Dr. May was a treating rheumatologist. Dr. Hubbard was a treating neurosurgeon. They both saw the claimant during the period of about 2000 to around 2002, and there were some gaps in that, but basically they saw her on multiple occasions, each of them, and throughout that couple-year period that's relevant in this case. And as to the relevant date, I think it's important to emphasize that this is a Title II disability insurance case only, which means there is a date last insured, as we call it, a date when the insured status expires. And that, in this case, is December 31, 2000. And so really this entire case should be looked at by reference to that date last insured, that December 31, 2000. What happened in this case was the ALJ discounted or rejected evidence that was submitted or became available years after that date last insured in October 2003, and that includes Dr. Weeks' opinion statement. That includes Ms. Reshing's testimony. And that includes Mr. Reshing's testimony, all of which dated October 2003. You can't discount it because of when it occurred. You can discount it because when it's back. That's exactly right, Your Honor. But I think it's still worth noting that what the ALJ did rely on was evidence that surrounded and was right about the time and before and shortly after the period of the date last insured, the December 31, 2000. He specifically relied on Dr. May's treatment notes, Dr. Hubbard's treatment notes from that period of time, as well as even the treating family physicians, Dr. Weeks' treatment notes from that period of time, as well as the lay statement from Ms. Reshing's mother, which was just eight days after the date last insured expired. And so what we have is an ALJ that relied on evidence that is really more relevant to the period of time, that issue in this case, and gave numerous reasons for each of the other pieces of evidence that came later to not count or rely on that evidence. Did the doctors talk about the lack of necessity for breaks? I believe Dr. Weeks did in her October 2003 statement, which the ALJ did as a whole reject for a few different reasons. So, no. Dr. May and Dr. Hubbard and even Dr. Weeks in the treatment notes in and around the time of the date last insured did not specifically discuss the need for breaks. But it was, I believe, mentioned in the October 2003 statement from Dr. Weeks, which the ALJ rejected for two reasons. One, that it was inconsistent with the objective findings that Dr. May and Dr. Hubbard had from their contemporaneous records at the time of the date last insured, but also because those treatment notes, the opinions of Dr. Weeks in October 2003 were inconsistent with her own treatment notes from the period around the date last insured. Your Honors, the Commissioner would ask that this Court affirm the judgment of the district court. Thank you. Thank you very much. I would only comment that Dr. Hubbard and Dr. May did not quantify capacities. They just didn't do it. Unless the Court has questions, I'll stop. Thank you very much. Thank you. The vote of counsel in the case of Rushing v. Astro is submitted.
judges: Farris, Nelson D. W., Berzon